UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

DANIEL SANDERS,                          )
                                         )
     *Plaintiff*,                       )    No. 1:17-cv-00064-HSM-SKL
                                         )
v.                                       )
                                         )
COMMISSIONER OF SOCIAL SECURITY,         )
                                         )
     *Defendant*.                       )

## REPORT AND RECOMMENDATION

Plaintiff Daniel Sanders ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him disability insurance benefits ("DIB"). Each party moved for a judgment [Docs. 15 & 17] with supporting briefs [Docs. 16 & 18]. This matter is now ripe, and for the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings be **DENIED**; (2) the Commissioner's motion for summary judgment be **GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS

As reflected in the transcript of the administrative proceedings [Doc. 8 ("Tr.")], Plaintiff filed an application for DIB in October 2013, alleging disability beginning December 31, 2009 (Tr. 21, 138). After Plaintiff's claims were denied initially and upon reconsideration, a hearing on Plaintiff's claims was held before an administrative law judge ("ALJ") during which Plaintiff was represented by counsel. On March 15, 2016, the ALJ issued an unfavorable decision finding that Plaintiff was not under a "disability" as defined in the Social Security Act (the "Act"). The

Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  Plaintiff timely filed the instant action.

## II.    FACTUAL BACKGROUND

### A.    Education and Employment Background

Plaintiff was born on November 13, 1953 and has a work history that includes work as a mason worker (Tr. 154, 167).  He also sold scrap metal in 2012 (Tr. 167), and worked in a management role on a masonry jobsite in 2010 (Tr. 24, 37-38).  He has a high school education (Tr. 35-36, 159).

### B.    Medical Records

Plaintiff alleges disability due to degenerative disc disease in his back, carpal tunnel syndrome in both wrists, opioid addiction, osteoarthritis, and panic and anxiety disorder (Tr. 158). His alleged onset date is December 31, 2009 (Tr. 138), which is also his date last insured (Tr. 23).

Medical records from Riverside Family Medicine ("Riverside") were destroyed in a flood in May 2010, although Plaintiff had personal copies of the Riverside records dating from September 2003 until July 2005 (Tr. 247-72, 623).  Riverside had another flood in August 2013 (Tr. 623).  A letter from the officer manager at Riverside to counsel for Plaintiff states:

> This letter is in response to a request for medical records on a patient Danny Sanders.  Our office had a flood on May 3rd 2010 and another big one on August 8th 2013.  All medical records that were in storage were destroyed. All the records were of patients that had been seen in the past or that had been transferred out of the practice. . . . The insurance company should be able to pull the claims up for dates of service needed to get the diagnosis codes.  If you have any other questions, please don't hesitate to call . . . .

(Tr. 623).

Dr. Skyhawk Fadigan was Plaintiff's treating physician at Riverside.  Plaintiff's counsel sent Dr. Fadigan a letter in February 2016, asking for her response to yes or no questions

2

concerning Plaintiff's ability to work and his conditions. The record contains Dr. Fadigan's response, wherein she indicates, *inter alia*, that she remembered seeing Plaintiff "a couple y[ea]rs after 2005," but she was not sure when she last treated him (Tr. 234). This letter is discussed in more detail later in this opinion.

Defendant argues that Plaintiff "submitted no medical records dated after February 2006 or before January 2013." [Doc. 18 at Page ID # 697]. Plaintiff does not cite to any such records, and I was unable to find any after reviewing the record. This means there is no medical evidence of Plaintiff's condition for over three years prior to or after Plaintiff's alleged onset date (other than arguably the 2016 letter from Dr. Fadigan, although she indicates she did not see him for approximately two years before the alleged onset date). The state agency doctors found: "there is insufficient evidence to assess severity of conditions back to . . . 12/31/09" (Tr. 71, Charles Settle, M.D.); "Claim is insufficient to assess for DIB" (Tr. 71, Jenaan Khaleeli, Psy.D.); "INSUFFICIENT: the [file] does not contain any medical information from within 12 months of the [alleged onset date]" (Tr. 81, James Millis, M.D.); and "Unable to review/rate mental allegations due to lack of evidence" (Tr. 81, Larry Welch, Ed.D.). As a result, on initial review and reconsideration, the state agency doctors determined Plaintiff did not have a combination of impairments that was severe (Tr. 72, 81).

### C. Hearing Testimony

At the hearing before the ALJ, Plaintiff and a vocational expert ("VE") testified. The transcript of the testimony at the hearing (Tr. 32-65) has been carefully reviewed.

3

# III.   ELIGIBILITY AND THE ALJ'S FINDINGS

## A.   Eligibility

"The Social Security Act defines a disability as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 646 (6th Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)); *see also Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (quoting 42 U.S.C. § 423(d)(1)(A)). A claimant is disabled "'only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Parks*, 413 F. App'x at 862 (quoting 42 U.S.C. § 423(d)(2)(A)). The Social Security Administration ("SSA") determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The five-step process provides:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment—i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities—the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

4

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citations omitted). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512-13 (6th Cir. 2010) (citations omitted).

### B. The ALJ's Findings

The ALJ found Plaintiff last met the insured status requirements on December 31, 2009, which is also his alleged onset date[1] (Tr. 23). At step one of the process, the ALJ found Plaintiff did not engage in substantial gainful activity on that date (Tr. 23). At step two, the ALJ found Plaintiff had medically determinable impairments of bilateral carpal tunnel syndrome status post release, degenerative disc disease of the lumbar spine, and generalized anxiety disorder (Tr. 23). However, the ALJ further found that these impairments, either alone or in combination, did not significantly limit his ability to perform basic work-related activities for 12 consecutive months; therefore, the ALJ concluded that Plaintiff did not have a severe impairment or combination of impairments (Tr. 23-24). These findings led to the ALJ's determination that Plaintiff was not under a disability as defined by the Act on December 31, 2009 (Tr. 26).

### IV. ANALYSIS

Plaintiff asserts this matter should be reversed and remanded under sentence four for three reasons: (1) the ALJ "ran afoul" of the treating physician rule because the ALJ failed to discuss the letter from Dr. Fadigan; (2) the ALJ "erred in failing to find severe impairments when they

---

[1] A claimant must establish disability onset prior to the expiration of insured status to be eligible for DIB; thus, as the Commissioner points out, the only relevant day for consideration of Plaintiff's claim is December 31, 2009, which is both Plaintiff's alleged disability onset date and the date his insured status expired. *See* 42 U.S.C. §§ 416(i)(3)(B) & 423(c)(1)(B); 20 C.F.R. § 404.130.

5

were demonstrated and were not conditions subject to spontaneous remediation"; and (3) the ALJ "engage[d] in examination of a witness outside of the hearing of the claimant and his attorney" without providing "notice of the examination of the witness and an opportunity to respond." [Doc. 16 at Page ID # 688-89].

### A. Standard of Review

The Social Security Act authorizes "two types of remand: (1) a post-judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)). Under a sentence-four remand, the court has the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing." 42 U.S.C. § 405(g). Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, No. 10-207, 2011 WL 2292305, at *8 (E.D. Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (citations omitted). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (citations omitted). If there is

6

substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sept. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claims of error without further argument or authority may be considered waived).

### B. Treating Source Opinion

Plaintiff has medical records showing Dr. Fadigan treated Plaintiff at Riverside at least from September 2003 through July 2005 (Tr. 247-72). Dr. Fadigan appears to have primarily treated Plaintiff for back pain. A March 2004 MRI performed for Dr. Fadigan revealed

7

"[a]dvanced degenerative disc space changes at L5-S1 and to a lesser exten[t] at L3-4 and L4-5." (Tr. 263). However, the MRI also shows "no evidence of an acute osseous abnormality," "normal lumbar vertebral body height and alignment," and "minimal levoconvex curvature of the midlumbar spine." (Tr. 263). He was referred to physical therapy (Tr. 262). A second MRI performed approximately two weeks later again shows normal "lumbar vertebral body heights," and only "[s]ome mild narrowing of L5-S1 disc height with vacuum phenomenon consistent with degenerative disc disease." (Tr. 259). Plaintiff continued to complain of back pain through July 2005, but the only treatment discernible from Dr. Fadigan's notes, other than the physical therapy, is medication (*see* Tr. 249).

Plaintiff also complained of pain in his wrists/elbows (Tr. 255). Dr. Fadigan referred him to Neurological Surgeons, PC (Tr. 355), and he had surgery on both of his wrists to alleviate carpal tunnel syndrome in November 2005 (Tr. 289). The record contains a note from Allen Vaughan, M.D., to Dr. Fadigan written on January 27, 2006[2], which states, "Mr. Danny Sanders returns to the office one 01/27/06. He is postop carpal tunnel. He has done nicely. I will discharge from my care." (Tr. 316).

As mentioned, in 2016, counsel for Plaintiff wrote Dr. Fadigan a letter in connection with Plaintiff's disability application. Dr. Fadigan returned the letter, with handwritten responses to the mostly "yes" or "no" format of the questions. The letter is quoted in large part below, with Dr. Fadigan's answers in bold:

> Mr. Sanders is a former patient of yours who was a mason (bricklayer) who you treated at Riverside Family Medicine. He had degenerative disc disease and carpal tunnel syndrome, anxiety and hypertension. I have attached notes of yours to this correspondence.

---

[2] The fact that Dr. Vaughan wrote the letter to Dr. Fadigan in January 2006 suggests that Dr. Fadigan was still seeing Plaintiff as a patient in January 2006, which is consistent with her memory of seeing Plaintiff "a couple y[ea]rs after 2005" (Tr. 234).

8

These were records of which Mr. Sanders had copies. In 2010 and 2013 Riverside suffered floods destroying records, so records that weren't already produced to patients could not be after that time. . . .

I write to you today because Mr. Sanders has a Social Security Disability claim that is being decided by a Social Security judge. The burden is on Mr. Sanders to present evidence supporting his claim. He is last "covered" for disability on 12-31-2009, [so] he would have to prove that as of then and following, he could not return to work as a brick mason and that his ability to work as of that date and forward would have been at most, light level work (like a grocery store cashier). We have proof of his medical condition and problems in recent years but there is a big gap in the records from about 2006 through 12-31-2009 his date last covered for benefits.

The Records we do have from you end in July of 2005. Mr. Sanders indicates he kept seeing you for some years after that time.

> 1 – Do you remember seeing Mr. Sanders in the years after 2005? . . . .
> **I remember seeing him however do not recall the last time he was seen, certainly a couple yrs after 2005.**

> 2 – . . . [D]o you recall that is back and hands (wrists) were still problematic for him in the years after July 2005?
> **Yes**

Brick masonry is Medium level exertional work and the vocational expert at Mr. Sander's hearing testified that it required full bilateral manual dexterity to perform it full time. [Goes on to quote the definition of medium work from Social Security Ruling ("SSR") 83-10].

> 3 – Based on what was wrong with him in 2005 do you think he could have returned to full time, full duty, brick masonry given what was wrong with him then?
> **No.**

Mr. Sanders has not had any additional surgery on his hands/wrists, and hasn't had any back surgery.

> 4 – Based on what was wrong with him at that time, do you believe those conditions would be likely to resolve with time such that he would have been later restored to the ability to return to brick masonry?     **No**

9

Social Security rules indicate that Mr. Sanders should be allowed disability benefits if he is found able to perform a full range of light level work at most on or before 12-31-2009.

> 5 – Based on what was wrong with him when you last saw him (July of 2005 or based on your recollection [at] a later date) do you think he had greater than light level work ability on a full time 8 hour per day 5 day per week basis?
> **No**

> 6 – Do you think that his condition would have improved with time such that he would have had medium level work ability after that date (as he grew older do you think his abilities would have increased?)
> **No**

(Tr. 234-36).

In her decision, the ALJ wrote that "[t]he record shows no treating source statements." (Tr. 25). Although Dr. Fadigan's notes from September 2003 through July 2005 are contained in the record (Tr. 247-72), the ALJ does not cite to or discuss them at all. Plaintiff argues the ALJ's failure to credit or even discuss Dr. Fadigan's answers in the letter violates the treating physician rule and constitutes harmful error requiring remand [Doc. 16 at Page ID # 689-91]. Defendant argues Dr. Fadigan was not a treating source in December 2009, the relevant time period for determining Plaintiff's disability. Defendant also argues that, even if Dr. Fadigan is a treating physician, the ALJ's failure to discuss her opinion is not harmful error because the opinion is so patently deficient that "the ALJ could not possibly have credited it." [Doc. 18 at Page ID # 703 (citing *Watters v. Comm'r of Soc. Sec.*, 530 F. App'x 419, 423 (6th Cir. 2013)]. Defendant insists that "remanding the case for the ALJ to discuss Dr. Fadigan's opinion would serve no purpose as there are no medical records from the relevant time period to support the opinion." [*id.* at Page ID # 704].

10

Under the treating physician rule, when considering a claim for disability the ALJ generally must give the opinion of the claimant's treating physician "controlling weight." 20 C.F.R. § 404.1527(c)(2).[3] But the ALJ must do so only if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* If the opinion is not given controlling weight, the ALJ must consider the following factors to determine what weight to give it: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527). The ALJ is not required to explain how she considered each of these factors, but must nonetheless give "good reasons" for giving a treating physician's opinion less than controlling weight. *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (citing SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)); *see also* 20 C.F.R. §§ 404.1527(c)(2) (the ALJ must "give good reasons in [the] notice of determination or decision for the weight . . . give[n the] treating source's medical opinion."); *Morr v. Comm'r of Soc. Sec.*, 616 F. App'x 210, 211 (6th Cir. 2015) (holding "good reasons" must be provided "that

---

[3] On January 18, 2017, the SSA published final rules titled "Revisions to Rules Regarding the Evaluation of Medical Evidence." 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017) (amending and correcting the final rules published at 82 Fed. Reg. 5844-01). The current regulation is titled "Evaluating opinion evidence for claims filed before March 27, 2017." 20 C.F.R. § 404.1527. The "treating physician rule" and Social Security Rulings ("SSRs") 96-2p, 96-5p, and 06-03p, were rescinded as of March 27, 2017, and claims filed after that date are not covered by these rulings. *See* 82 Fed. Reg. 15263-01, 2017 WL 1105348 (Mar. 27, 2017); *see also* 20 C.F.R. §§ 404.1520c, 416.920c ("How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017"). Claims filed prior to March 27, 2017, are still covered by these rules and regulations. In this case, the ALJ applied the rules and regulations that were in effect at the time of the decision on March 15, 2016, and I will do the same.

11

are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." (internal quotation marks omitted) (citing *Wilson*, 378 F.3d at 544)).

Failure to comply with the treating physician rule, however, may be deemed harmless error if:

> (1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; (3) where the Commissioner has met the goal of § 1527(d)(2) . . . even though [he] has not complied with the terms of the regulation.

*Watters v. Comm'r of Soc. Sec.*, 530 F. App'x 419, 423 (6th Cir. 2013) (quoting *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011)) (alteration in original; other citation omitted). Nevertheless, a "procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway." *Wilson*, 378 F.3d at 546 (internal quotation marks and citations omitted).

As mentioned, Defendant first argues that the record shows Dr. Fadigan should not be considered a treating physician because she stopped treating Plaintiff a number of years before his alleged onset date.[4]  Contrary to this argument, the regulation in effect at the time of the ALJ's decision defines a "treating source" as:

> [Y]our own physician, psychologist, or other acceptable medical source who provides you, *or has provided you*, with medical treatment or evaluation and who has, *or has had*, an ongoing

---

[4] Defendant argues there "is no support for the suggestion that Dr. Fadigan treated Plaintiff after 2005." [Doc. 18 at Page ID # 703].  This is not accurate.  In his Adult Disability Report, Plaintiff does indicate that he last saw Dr. Fadigan in 2005 (Tr. 164).  However, Dr. Fadigan wrote in her letter to Plaintiff's counsel that she remembered seeing Plaintiff "certainly a couple y[ea]rs after 2005." (Tr. 234).  That same letter indicates that Plaintiff also remembered seeing Dr. Fadigan "for some years" after July of 2005 (Tr. 234).  Regardless, Defendant is correct that there is no proof Dr. Fadigan was seeing Plaintiff as a patient at any time close to December 2009.

> treatment relationship with you. Generally, we will consider that
> you have an ongoing treatment relationship with an acceptable
> medical source when the medical evidence establishes that you see,
> *or have seen*, the source with a frequency consistent with accepted
> medical practice for the type of treatment and/or evaluation required
> for your medical condition(s).

20 C.F.R. § 404.1502 (version effective June 13, 2011, to March 26, 2017) (emphasis added). The

plain language of this regulation indicates that a physician who has provided care to a claimant in

the past can be considered a treating physician. Defendant cites no authority to the contrary.

Perhaps Dr. Fadigan's opinion should be considered less authoritative due to the fact that her

treatment pre-dates Plaintiff's alleged onset date by at least one to two years but that fact does not

change the character of her earlier treating relationship with Plaintiff for purposes of this Court's

review. Accordingly, I **FIND** Dr. Fadigan should have been considered a treating physician and

the ALJ erred when she found "the record shows no treating source statements," instead of

addressing Dr. Fadigan's handwritten responses to the letter and her 2003-05 records (Tr. 25).

Defendant's second argument, that Dr. Fadigan's opinion is "patently deficient" and

therefore the ALJ's failure to credit it or give good reasons for discounting it is harmless error, has

more merit. Courts have long held that ALJs "may properly give little weight to a treating

physician's 'check-off form' of functional limitations that 'did not cite clinical test results,

observations, or other objective findings.'" *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566-

67 (6th Cir. 2016) (quoting *Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011)) (also citing other

cases). In this case, Dr. Fadigan's opinion is merely answers to six yes-or-no type questions posed

by counsel, and she cites to no medical evidence or information to support her answers.

Furthermore, she admits her treatment of Plaintiff ended well before his alleged onset date. She

does not produce and does not cite to any medical evidence or information from near the time of

Plaintiff's alleged onset date; nor is there any in the record. *Cf. Blakley v. Comm'r*, 581 F.3d 399,

13

409-10 (6th Cir. 2009) (finding harmful error in ALJ's "incomplete weighing of Blakley's treating sources" because Blakley produced "numerous x-rays, CT scans, and MRIs" which "present objective findings that are, at the very least, not inconsistent with his treating physicians' opinions.")  Her responses were written over six years after the alleged onset date, and apparently close to ten years after Dr. Fadigan concluded her treatment of Plaintiff.  *Cf. Shields v. Comm'r of Soc. Sec.*, No. 17-6091, 2018 WL 2193136, at *8 (6th Cir. May 14, 2018) (remanding for violation of treating physician rule; noting that the parties did not dispute that the doctor "treated Shields during the period that she alleges being disabled.").  Her responses are also extremely conclusory, and describe no functional limitations at all.  For example, without even explaining the requirements of "light work" other than describing it as "like a grocery store cashier," counsel asks Dr. Fadigan to opine, based on her experience with Plaintiff nearly a decade prior, whether Plaintiff "had greater than light level work ability" (Tr. 234, 236).

In *Watters*, the relevant time for determining the claimant's eligibility was between December 31, 2002 and December 31, 2007.  530 F. App'x at 421.  Watters, much like Plaintiff, had no medical records from that period.  Watters submitted a letter from his treating physician, Dr. Michael Kopec, who began treating Watters in July 2009.  *Id.* at 422.  The letter discusses "multiple imaging studies performed" between July and October 2009, and describes how the "findings on x-ray and MRI represent changes that are chronic in nature, and . . . seem to correspond to his pain complaints and his clinical presentation."  *Id.*  Dr. Kopec wrote that he could "reasonably conclude from objective imaging that Mr. Watters' pain complaints originate from processes that are chronic in nature.  Therefore, it is reasonable that Mr. Watters' current state of physical limitation could have begun at the specified time that he reports."  *Id.*

14

Unlike in this case, the ALJ in *Watters* (and in the other cases finding no error where "little weight" was assigned to a treating physician's opinion) did at least acknowledge the treating doctor's opinion, but refused to credit it, for the sole reason that there was "simply no medical evidence" to support the doctor's conclusions. *Id.* at 423. The trial court and the United States Court of Appeals for the Sixth Circuit affirmed, with the Sixth Circuit noting that the imaging studies Dr. Kopec discussed in his letter were performed in 2009, "substantially outside of the relevant time period," which was between the end of 2002 and the end of 2007. *Id.* n.1. The court acknowledged that the ALJ did not provide good reasons for discounting Dr. Kopec's opinion, but found the failure to be harmless error:

> In this case, Dr. Kopec's opinion as it relates to the relevant period is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques." In fact, it is not supported by anything other than Dr. Kopec's inferred onset date of Watters's disability, which he bases entirely on his conclusion that Watters's condition is "chronic" and that it would be "reasonable" to conclude that his disability "could have begun at the specified time that he reports"—7 years prior to Dr. Kopec's evaluation. . . . Dr. Kopec's opinion was so "patently deficient" that the ALJ could not possibly have credited it. Therefore, his failure to explain his "good reasons" for not granting controlling weight to Dr. Kopec's opinion is properly viewed as harmless error.

*Id.* at 423 (footnote omitted). Here, Dr. Fadigan's opinion is not supported by citation or reference to any clinical and laboratory diagnostic techniques at all, much less any from the relevant time period.

Plaintiff did not address the issue of harmless error or even respond to Defendant's "patently deficient" arguments. Certainly, the ALJ's total failure to acknowledge Dr. Fadigan's responses to counsel's post-hearing letter is troubling. However, the Sixth Circuit has found harmless error in other situations where an ALJ failed to discuss a treating physician's opinion. *See Wilson*, 378 F.3d at 547 (Discussing *Heston v. Comm'r*, 245 F.3d 528 (6th Cir. 2001), wherein

the court held that the "ALJ's failure to discuss the report of the claimant's treating physician constituted harmless error" because the ALJ considered limitations similar to those of the treating physician.). Moreover, "where 'remand would be an idle and useless formality,' courts are not required to 'convert judicial review of agency action into a ping-pong game.'" *Id.* (quoting *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969) (plurality opinion)).

Accordingly, while I **FIND** the ALJ erred by failing to consider and discuss Dr. Fadigan's opinion, I also **CONCLUDE** such error was harmless in this case because, among other things, Dr. Fadigan's opinion as it relates to the relevant period is not well supported by medically acceptable clinical and laboratory diagnostic techniques.

### C.      Lack of Severe Impairments

Plaintiff next argues that the ALJ "erred in failing to find severe impairments where they were demonstrated and were not conditions subject to spontaneous remediation." [Doc. 16 at Page ID # 691]. At step two, "the ALJ must find that the claimant has a severe impairment or impairments" to be found disabled. *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88 (6th Cir. 1985). "Under the prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Watters*, 530 F. App'x at 421 (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "Although the standard is *de minimis*, the plaintiff still bears the burden of demonstrating that he suffers from a medically determinable physical impairment—a burden that requires 'medical signs and laboratory findings.'" *Id.* (quoting SSR 96-4p, 1996 WL 374187, at *1). "The mere diagnosis of [an ailment] . . . says nothing about the severity of the condition." *Higgs*, 880 F.2d at 863. Rather, a claimant must "produce or point to *some* evidence that indicates that an alleged impairment impacts his ability to perform basic work activities." *Johnson v. Astrue*,

No. 3:09-CV-317, 2010 WL 2803579, at *5 (E.D. Tenn. June 30, 2010), *R&R adopted*, No. 3:09-CV-317, 2010 WL 2836137 (E.D. Tenn. July 15, 2010).

Plaintiff does not contend he has records showing his medical condition on or near December 31, 2009.  His argument on this issue is based primarily on his belief that the ALJ overlooked the fact that Riverside had two floods that destroyed Plaintiff's medical records; one on May 3, 2010, and one on August 8, 2013 [*id.* at Page ID # 691-92].  The ALJ recognized that there was at least one flood in 2010 (Tr. 24); it is unclear how the ALJ's alleged failure to consider the second flood is relevant.  Plaintiff points to nothing in the record indicating that he received treatment from Riverside for more than "a couple y[ea]rs after 2005," which would be 2007 (Tr. 234).  Any destroyed records were therefore still at least two years out of date by the time of Plaintiff's alleged onset date/date last insured.  Plaintiff also does not cite to records from any other providers from any time near December 31, 2009.  The state agency doctors who reviewed Plaintiffs' records agreed Plaintiff failed to provide sufficient proof to establish a severe impairment (Tr. 72 ("Does the individual have a combination of impairments that is severe? No"); 81 (same)).  The ALJ gave their opinions "great weight." (Tr. 25).

The ALJ did discus an MRI from July 2005 from Riverside, which showed "mild disc bulges" and one "mildly narrowed" disc, but "no evidence of disc herniation or spinal stenosis." (Tr. 25, 273).  The "Findings" section of that MRI states that there was "mild narrowing of L5-S1 disc heights with vacuum phenomenon consistent with degenerative disc disease." (Tr. 275).  The ALJ also discussed what appears to be the next MRI in the record, from Chattanooga Imaging in September 2013, which shows "mild to moderate degenerative disc disease" (Tr. 25, 367-68).  These MRIs are far outside of the relevant time period for evaluating Plaintiff's claim for DIB.

Plaintiff cites to no "medical signs and laboratory findings" that would support a finding of a severe impairment on December 31, 2009, based on his degenerative disc disease.

Plaintiff also declares that the "carpal tunnel syndrome and the degenerative disc disease continued to be limiting in basic work related functions and should therefore have been found to be severe," citing the letter from Dr. Fadigan [Doc. 16 at Page ID # 692]. In effect, Plaintiff argues his disability in 2009 should be inferred from the fact that he had these conditions in 2005. The degenerative disc disease evidence is addressed above and does not contradict the ALJ's finding that Plaintiff was not disabled in 2009. As for the carpal tunnel syndrome, the ALJ notes that Vaughan Allen, M.D., performed a "release" procedure on both of Plaintiff's hands in 2005. The ALJ notes that the procedure was completed "without complication," and that Dr. Allen discharged Plaintiff from his care in January 2006 (Tr. 25). The ALJ then notes that "the record shows no further treatment recorded until August 2013" (Tr. 25). Plaintiff cites to no records showing any treatment for carpal tunnel syndrome after 2006. The flood presumably did not affect many of the medical records concerning carpal tunnel syndrome, as his surgery was performed by Dr. Allen at Neurological Surgeons, PC, not by anyone at Riverside. Notes from a physical therapist at Neurological Surgeons state that, "[s]hould he have any problems, he knows he may follow up with a phon[e] call." (Tr. 289).

Plaintiff briefly mentions his generalized anxiety disorder [Doc. 16 at Page ID # 691]. The ALJ found that "anxiety is not noted in the record until January 2013 when the claimant began treatment for opioid addiction and generalized anxiety disorder with Paul Turpin, M.D." (Tr. 25). The ALJ quite reasonably found that diagnosis did not support a finding of disability, considering it was rendered more than three years after Plaintiff's alleged onset date and date last insured, and furthermore because the record reflected that "[t]reatment notes repeatedly show the claimant's

18

mood and affect were normal and the opioid dependence in remission." (Tr. 25). Plaintiff does not specifically challenge this finding by the ALJ.

I **FIND** the ALJ appropriately considered the medical evidence at step two. The ALJ's decision that Plaintiff failed to show he had a severe impairment is supported by the total lack of medical evidence or treatment records from the relevant time period. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (affirming ALJ's finding of no disability where claimant's only evidence was from two years prior to her alleged onset date and three years after the expiration of her insured status).

### D.    Due Process

Last, Plaintiff takes issue with the fact that the ALJ asked the administrative hearing reporter questions after Plaintiff and his counsel had left the hearing room. Plaintiff argues the "ALJ can't do that without notice to the claimant and counsel and providing opportunity to participate." [Doc. 16 at Page ID # 692]. The testimony, in its entirety, was as follows:

> ALJ:    Okay. As the attorney was going out the door, and I thought we had finished the hearing and I'm writing my notes, he turns around and talks . . . to the hearing reporter, about giving her some forms. And I said, "You couldn't have given her this before the hearing so I could have," what I meant was, marked it for the hearing. And he mumbles something. And I have bad ears, I have a hearing problem. I don't know what he said. I'm asking the hearing reporter -- I'm going to swear you in.
>
> (The witness, AMANDA LAMBERT, having been first duly sworn, testified as follows:)
>
> **Examination of Witness by Administrative Law Judge**
>
> Q     What is your name?
>
> A     Amanda Lambert.
>
> Q     Now, what did he say, and what did he do outside, and why -- what was going on with this that he dropped -- he told you outside

that he wasn't turning this in, and as he's leaving today he decides to turn it in?

A       The one form, yes, your honor, is the standard form we have everyone sign with the current address to make sure it's correct. This form is a form about the claimant's work background, which is empty and it says no work since 8/14.  And the medications list, he has two filled out, but he said they were not relevant to the case because these are medicines that the claimant is currently taking and [was] not taking at date last insured.  So, he said they weren't relevant and he didn't give them to me to put in.

Q       And when he was leaving, did he give them to you to make them part of the form?

A       Yes, when he just left, he handed them to us, I guess to exhibit.

ALJ:   All right.  I don't know where those should go and I don't even know if they should go in the form.  I would group them in the E section and mark, not relevant due to the time of the date last -- the onset date and the date last insured.  And I would make a note for the exhibit thing and say, attorney said pre-hearing that he was not introducing these because they were not relevant, and then attorney introduced them at the conclusion of the hearing.

[Hearing reporter]:     Yes, your honor.  Off the record?

        (The hearing concluded at 2:17 p.m. on February 18, 2016).

(Tr. 63-65).

Defendant contends the testimony did not relate to Plaintiff's impairments nor go to the merits of Plaintiff's disability claim, but "rather how documents submitted should be exhibited in the administrative record." [Doc. 18 at Page ID # 706].  I **FIND** Defendant has the much better argument.  Plaintiff makes no effort to explain how this testimony impacted his case in any way. Moreover, the two regulations Plaintiff cites—with no further explanation—in support of his argument in no way indicate that the taking of such non-substantive testimony outside the presence of Plaintiff and his counsel justifies a reversal or remand of the ALJ's decision.  *See* 20 C.F.R. §

20

404.936 ("Time and place for a hearing before an administrative law judge."); 20 C.F.R. § 404.949 ("Presenting written statements and oral arguments"); *see also Woods*, 2009 WL 3153153, at *7 (W.D. Mich. Sept. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claims of error without further argument or authority may be considered waived).

## V.    CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I RECOMMEND[5] that:

1) Plaintiff's motion for judgment on the pleadings [Doc. 15] be **DENIED**;

2) The Commissioner's motion for summary judgment [Doc. 17] be **GRANTED**; and

3) The Commissioner's decision denying benefits be **AFFIRMED**.

s/ *Susan K. Lee*

SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).